**ORAL ARGUMENT NOT YET SCHEDULED**

**Court of Appeals No. 14-5174**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

FREEDOM WATCH, INC.,
Plaintiff-Appellant,

v.

NATIONAL SECURITY AGENCY
Defendants-Appellees.

_____

APPEAL FROM AN ORDER
OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
IN CIVIL CASE NO. 1:12-cv-01088

_____

BRIEF OF PLAINTIFF-APPELLANT FREEDOM WATCH, INC. FOR
REVERSAL OF THE DISTRICT COURT'S ORDER AND REQUEST FOR
ORAL ARGUMENT

_____

Larry Klayman, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

Attorney for Plaintiff-Appellant

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Plaintiff-Appellant Freedom Watch, Inc. hereby certifies pursuant to Circuit Rule 28(a)(1) that:

**A. Parties and Amici**

The parties that appeared in the District Court in Civil Case No. 1:12-cv-01088 are Plaintiff Freedom Watch, Inc., and Defendants National Security Agency; Central Intelligence Agency; Department Of Defense; and Department Of State.

Appellant is not aware of any amici curaie appearing at this time.

**B. Rulings Under Review**

The rulings under review are the trial Court's Order and final judgment and its Memorandum Opinion issued by the Honorable District Judge Robert L. Wilkins on June 12, 2014 in the United States District Court for the District of Columbia, Civil Case No. 1:12-cv-01088  (ECF Docket #'s 24 and 25), which granted Defendants' Motion For Summary Judgment, entered judgment for Defendants; and all other orders and rulings adverse to Plaintiff in this case, from which the appeal arises in the above styled case by the Appellant's Notice of Appeal filed July 14, 2014.

**C. Related Cases**

Plaintiff-Appellant is not aware of any related cases.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES..............i

TABLE OF AUTHORITIES....................................................................................iv

GLOSSARY.......................................................................................................vii

JURISDICTIONAL STATEMENT.........................................................................1

ISSUES PRESENTED...........................................................................................1

STATEMENT OF THE CASE................................................................................2

STATEMENT OF FACTS ....................................................................................5

STANDARD OF REVIEW...................................................................................11

SUMMARY OF ARGUMENT.............................................................................12

ARGUMENT.......................................................................................................13

    A.  Judicial Precedent Must be Reconsidered to the Extent in Conflict with the Clear Congressional Intent of the Statute and Congressional Enactment..........13

    B.  Judicial Precedent Setting the Burden Upon the FOIA Requester Rejects the Core Purpose of the Freedom of Information Act……………………….......16

    C.  No Support Can be Found in the Congressional Enactment to Carve Out Onerous Exception Unique to the Freedom of Information Act…………........19

    D.  The District Court Erred When it Granted Defendants' Motion for Summary Judgment, Because the Defendants Did Not Establish that the Search was Adequate…………………………………………………………….……22

    E.  The District Court Erred When it Granted Defendants' Motion for Summary Judgment, Because the Defendants Did Not Meet their Burden Under the law…………………………………………………………………….......25

    F.  The District Court Erred When it Granted Summary Judgment Before Allowing Plaintiffs to Take Discovery of the Defendants…………………….28

G. The District Court Abused its Discretion When It Granted Summary Judgment Despite Plaintiff Having Filed a Rule 56(d) Affidavit……………...31

H.  The District Court Erred in Finding that the Defendants Had Properly Exempted the Release of Entire Documents and Redacted Portions of Otherwise……….......................................................................................36

CONCLUSION.................................................................................................40

CERTIFICATE OF COMPLIANCE.....................................................................42

CERTIFICATE OF SERVICE.............................................................................43

APPENDIX 1..................................................................................................44

APPENDIX 2..................................................................................................46

# TABLE OF AUTHORITIES

## Cases

*Rugiero v. U.S. Dep't of Justice,* 257 F.3d 534 (6th Cir. 2001) ..................................... 15

*Arizona v. Thompson*, 281 F.3d 248 (D.C. Cir. 2002) ................................................. 11

*\*Association of Am. Physicians & Surgeons v. Clinton*, 997 F.2d 898 (D.C. Cir. 1993). 12, 34, 35

*Byrd v. Envtl. Prot. Agency*, 174 F.3d 239 (D.C. Cir. 1999) ....................................... 32

*Candelario del Moral v. UBS Fin. Servs. Inc. of P.R.*, 699 F.3d 93, 99 (1st Cir. 2012) ............. 12

*Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 231 (D.C. Cir. 1999).................................... 32

*Carpenter v. U.S. Dep't of Justice, 470 F.3d 434* (1st Cir. 2006)................................... 15

*\*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................... 30

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ....................................................... 6

*Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Wash.*, 699 F.2d 1274 (D.C. Cir. 1983) ......................................................................................... 32

*Dep't of the Air Force v. Rose*, 425 U.S. 352 (1976) ................................................. 15

*Dickens v. Whole Foods Market Group, Inc.*, 2003 WL 21486821 (D.D.C. Mar. 18, 2003)....... 30

*Gentiva Healthcare Corp. v. Sebelius*, 2013 U.S. App. LEXIS 14886 (D.C. Cir. July 23, 2013) 11

*\*Ginsburg, Feldman & Bress v. Federal Energy Admin.*, 591 F.2d 717 (D.C. Cir. 1978) .......... 14

*Hotel & Rest. Employees Union, Local 25 v. Attorney Gen.*, 804 F.2d 1256 (D.C. Cir. 1986) ... 32

*Hunton & Williams v. U.S. Dep't of Justice*, 590 F.3d 272 (4th Cir. 2010)................................ 26

*Iturralde v. Comptroller of Currency*, 315 F.3d 311 (D.C. Cir. 2003)........................................ 27

*Judicial Watch, Inc. v. Dep't of Commerce*, 337 F.Supp.2d 146 (D.D.C. 2004).......................... 30

*Judicial Watch, Inc. v. Dep't of Commerce*, 34 F.Supp.2d 28 (D.D.C. 1998)............................. 30

\* Authorities chiefly relied upon are marked with asterisks.

*Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir., 2003) .................................. 14

*King v. DOJ*, 830 F.2d 210 (D.C. Cir. 1987) ............................................................... 36

*LaDuke v. Nelson*, 762 F.2d 1318 (9th Cir. 1985) ......................................................... 6

*Lane v. Dep't of Interior,* 523 F.3d 1128, 1135 (9th Cir. 2008) ................................... 27

*Londrigan v. Fed. Bureau of Investigation*, 670 F.2d 1164 (D.C. Cir. 1981) ............................. 30

*Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ............................................................. 22

*Mack v. American Security & Trust Co.*, 191 F.2d 775, 777  (D.C. Cir. 1951) .......................... 18

*Maynard v. C.I.A.,* 986 F.2d 547, 560 (1st Cir. 1993) ........................................... 27, 28

*McGehee v. CIA*, 225 U.S. App. D.C. 205, 697 F.2d 1095, 1108 (D.C. Cir. 1983).................... 14

*Pardo-Kronemann v. Donovan,* 601 F.3d 599 (D.C. Cir. 2010) ....................................... 12

*Philips v. United States*, 59 F.2d 881, 885 (D.C. Cir. 1932) ....................................... 18

*Phillippi* v. *CIA,* 546 F.2d 1009 (1976) .................................................................. 38

*Prudential Locations LLC v. U.S. Dep't of Hous. & Urban Dev.,* 739 F.3d 424, 429 (9th Cir.,

2013) ................................................................................................ 14

*Public Citizen, Inc. v. Department of Educ.*, 292 F.Supp.2d 1, 7 (D.C. Cir. 2003)..................... 24

*Soto-Padró v. Pub. Bldgs. Auth.*, 675 F.3d 1, 5 (1st Cir. 2012).................................... 11

*Stern v. FBI*, 737 F.2d 84 (D.C. Cir. 1984)............................................................ 14

*Strang v. U.S. Arms Control & Disarmament Agency*, 864 F.2d 859 (D.C. Cir. 1989) .............. 30

*Sussman v. U.S. Marshals Serv.,* 494 F.3d 1106 (D.C. Cir. 2007) .............................. 26

*U.S. v. York*, 112 F.3d 1218 (D.C. Cir. 1997 .......................................................... 18

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert denied*, 415 U.S. 977 (1974) .... 10, 38, 39

**Statutes**

28 U.S.C. § 1291 ................................................................................................ 1

28 U.S.C. §1331 ................................................................................................ 1

5 U.S.C. § 552 ........................................................ 1, 2, 3, 4, 8, 13, 16, 19, 20, 22, 38

Federal Rules of Civil Procedure Rule 56 ............................................................. 11, 31

Federal Rules of Civil Procedure Rule 56(d) ..................................................... 11, 12, 30, 31, 33

# <u>GLOSSARY</u>

"FOIA" refers to the Freedom of Information Act, 5 U.S.C. § 552

"FRCP" refers to the Federal Rules of Civil Procedure

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this case pursuant to 28 U.S.C. §1331 because the matter arises under the Freedom of Information Act, 5 U.S.C. § 552. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

The District Court granted summary judgment on June 12, 2014. Plaintiff-Appellant timely filed its Notice of Appeal on July 14, 2014.  This appeal is from a summary judgment order that disposed of all of Plaintiff-Appellant's claims.

## ISSUES PRESENTED

1. Whether the District Court erred when it granted Defendant-Appellees' Motion for Summary Judgment.

2. Whether the District Court erred in denying Plaintiff-Appellant's discovery prior to the granting of Defendants-Appellees' Motion for Summary Judgment.

3. Whether the District Court erred in finding that the Defendants-Appelleess had properly exempted the release of entire documents and redacted portions of otherwise responsive material that was required to be produced by the Freedom of Information Act, 5 U.S.C. § 552, et seq.

## STATEMENT OF THE CASE

Plaintiff-Appellant Freedom Watch, Inc., as a public interest group acting on behalf of the public at large, filed a Freedom of Information Act ("FOIA") request (JA__) on June 1, 2012, pursuant to 5 U.S.C. § 552, *et. seq.*, submitting the identical FOIA request to four agencies: The National Security Agency, Central Intelligence Agency, U.S. Department of State, and U.S. Department of Defense.

Two of the defendant agencies, the National Security Agency ("NSA") and the Central Intelligence Agency ("CIA"), denied Freedom Watch's request for documents *in toto* and advised it of its right to administratively appeal.

The NSA denied Freedom Watch's request for documents, stating that the fact of the existence or non-existence of the requested materials is a classified matter and exempt from disclosure.  (JA__)

The CIA stated that it could neither confirm nor deny the existence or nonexistence of records responsive to Freedom Watch's request.  (JA__)

Plaintiff-Appellant Freedom Watch, Inc. filed a Complaint (ECF Docket #1) (JA__) against all four agencies as Defendants on June 27, 2012, in the United States District Court for the District of Columbia to enforce the terms of the Freedom of Information Act, Civil Case No. 1:12-cv-01088-RLW.

Defendants National Security Agency, Central Intelligence Agency, and

2

Department of State filed a Motion for Judgment on the Pleadings (ECF Docket #

4) on October 5, 2012, pursuant to Federal Rules of Civil Procedure 12(c), which

the District Court granted on December 13, 2012, (ECF Docket # 8).

The Motion raised several grounds, so which grounds motivated the Court to

grant the Motion are not clarified.  The Motion asserts that the Plaintiff-Appellant

did not exhaust administrative remedies with regard to the NSA and CIA.

Also, the U.S. Department of State in the Motion for Judgment on the

Pleadings challenged specific FOIA requests by inventing State's own assumptions

about the purpose behind the request for the documents rather than simply

determining if the State Department had those documents or not.

The Motion objected on Page 9 on behalf of State on the basis of the

requirement that a "request for records . . . *reasonably describe[]* such records." 5

U.S.C. § 552(a)(3)(A), and asserted on Page 1 on behalf of State

> "Rather, because each of the items of the request appears
> to be based on the premise that State provided information
> to the author of the *New York Times* article, State would
> first need to conduct an investigation into whether that
> premise is, in fact, true."

That assertion is untenable.  Pursuant to the Congressional command in FOIA,

State needed to merely search for whether it actually has the documents or not, not

to engage in philosophical introspection about the reasons for the request or the

existential meaning of the documents. State invented extra, optional steps on its own, then complained of the burden of those unnecessary, optional extra steps. Similarly, Freedom Watch did not ask State to make any distinction between documents leaked lawfully or unlawfully. Yet State objected that it was not required to make a legal determination as to whether any leaks were lawful or unlawful. That is, State objected to answering a question that no one asked.

Defendant Department of Defense filed a Motion for Partial Summary Judgment on October 5, 2012, (ECF Docket # 4) pursuant to Federal Rules of Civil Procedure 56, which the U.S. District Court granted on December 13, 2012, (ECF Docket # 8) (JA__). After Plaintiff-Appellant filed the Complaint, the DoD asserted the exemption set forth at 5 U.S.C. § 552 (b)(1).

By letter on October 1, 2012, (JA__) after the suit was under way, DoD informed Freedom Watch that it could neither confirm nor deny the existence or nonexistence of records responsive to Freedom Watch's request.

On June 12, 2014, the District Court entered summary judgment for the Defendants-Appellees without first allowing Plaintiff-Appellant the opportunity to take the necessary discovery.  (JA__)

On July 14, 2014, Plaintiff-Appellant appealed the decision granting summary judgment to this Court by duly entered Notice of Appeal (JA__).

## STATEMENT OF FACTS

On Friday June 1, 2012 the New York Times published an article (JA__) entitled "Obama Order Sped Up Wave of Cyberattacks Against Iran" written by David E. Sanger. This article released classified information to the American public, and it was obvious from the context that the Obama administration had publicly revealed classified information intentionally.

The untimely leak of the clandestine operation was obviously intended by some within the Obama Administration to harm Israel in these efforts or manipulate the Presidential election.  While the underlying operations were properly classified, the leak revealing the effort was not classified.  The Defendants adopted the untenable position that the circumstances and details of a leak – as opposed to the original classified information – cannot be revealed.

Now a demonstrated pattern of the Obama Administration systematically withholding documents and information from the American people raises an inference of bad faith.  From proven falsehoods by the U.S. State Department about the terrorist attacks on the Benghazi Consulate to providing hundreds of high-powered weapons to Mexican criminal gangs in "Fast and Furious," to the continuing, outrageous spoliation of evidence of illegality at the IRS, an Administration which consistently lies to the American people and hides

5

information cannot then demand to be given the benefit of the doubt.  Evidence

mounts of a government-wide policy to simply refuse to comply with FOIA.

Based on the above instances of Defendants-Appellees having found to have been

withholding the truth, a strong inference can be made that the Defendants-

Appellees are hiding the truth in this case as well. For example, the Supreme Court

case of *City of Los Angeles v. Lyons* involved repetitive unlawful conduct that gave

rise to evidentiary inferences of unlawful behavior. *See City of Los Angeles v.*

*Lyons*, 461 U.S. 95 (1983). Other courts have also ruled that a pattern of illegal

conduct may give rise to a strong evidentiary inference of illegal behavior against a

plaintiff. *See LaDuke v. Nelson*, 762 F.2d 1318 (9th Cir. 1985).  Thus, the

Defendants-Appellees' pattern of violative behavior creates a strong evidentiary

inference that they have also violated FOIA law in this case.  **For instance, of**

**importance, the Department of State has failed to produce transcripts of <u>New</u>**

**<u>York Times</u> Reporter David Sanger and Secretary of State Hillary Clinton**

**and other high-ranking officials at the Department of State, National Security**

**Council and other officials at the White House.  As shown in one of the**

**produced documents (Appendix 1), Sanger had access to the highest levels at**

**the Department of State and the National Security Council of the White**

**House.  As reported by Rowan Scarborough in an article entitled "In**

6

**classified cyberwar against Iran, trail of Stuxnet leaks leads to White House,"** **The Washington Times, dated August 18, 2013 (Appendix 2), these transcripts have been conspicuously withheld much less identified in the Department of State's document production. It is accepted and ordinary practice for transcripts to be made when a cabinet secretary is interviewed by a reporter in order that misreporting does not occur particularly with sensitive issues such as in this case the cyberattack on Iranian nuclear facilities using the Stuxnet virus and Israeli war plans. In this case, the issue involved the Islamic Republic of Iran which is at the pinnacle of U.S. foreign policy concerning its nuclear program and thus there is no doubt that the Department of State must have transcripts of the interviews, particularly with the Secretary.**

The leaking under then Secretary of State Hillary Clinton of this information is a cause for great concern and the American people have a right to know if and why it is occurring and whether the executive branch has been involved in the dissemination of this formerly classified information. Presumably, the U.S. Government confirmed this information to the New York Times which would require at least two independent, credible sources to publish a story.

Plaintiff Freedom Watch, in a lawful attempt to disseminate vital information to the American people, filed a FOIA request pursuant to 5 U.S.C. §

7

552 *et. seq* (JA___) in order to obtain documents related to publication of the articles related to massive "leaks" of information about the United States and its cyberattacks against the Islamic Republic of Iran.  This FOIA request was carefully drafted at great effort and is highly specific and precise in it document requests. The items sought were, in their entirety:

1) Any and all information that refers or relates to the <u>New York Times</u> article entitled "Obama Order Sped Up Wave of Cyberattacks Against Iran" by David E. Sanger on Friday, June 1, 2012, and which information was provided and leaked to Mr. Sanger and the New York Times;

2) Any and all information that refers or relates in any way to information released to David E. Sanger and/or made available to him;

3) The names of the persons, employers and job titles, and addresses of those who "leaked" the above information to David E. Sanger

4) Communications with The White House and/or Office of the President and/or Vice President that refer or relate in any way to the "leaked" information and/or the reasons for "leaking" the information;

5) Any and all information that refer or relate to the decision to "leak" the above previously classified information;

6) Any and all information that refers or relates to government agencies deciding to investigate who "leaked" the above previously classified information.

The leaking of this information, which the Defendants now claim "can neither be confirmed nor denied," is a cause for great concern and the American people have a right to know if and why it is occurring and whether the executive branch has been involved in the dissemination of this formerly classified information.   However, the U.S. Government already did confirm this information to the <u>New York Times</u> which normally requires at least two independent, credible sources to report a story.

The assertion of the exemptions from disclosure is misplaced, erroneous, and an abuse of the legal obligations under the FOIA, because Freedom Watch did not seek documents that are classified concerning cyberwarfare against Iran or any other classified matter.  *<u>Freedom Watch sought documents concerning a leak to the New York Times, and the reasons and circumstances of the leak.</u>*

The documents and information that the Obama Administration leaked to the <u>New York Times</u> were undoubtedly classified, yet released to the <u>New York Times</u> nevertheless.  However, the documents sought by Freedom Watch – *<u>about</u>* the leak and who leaked this information to David Sanger, not about Iran – are clearly not classified, but concern only the leak to the <u>New York Times</u> and the reasons for it.

Thus the Defendants and the District Court confused the classified material leaked to the <u>New York Times</u> with the unclassified topic of a leak to a reporter.

9

This Court should reverse the District Court's grant of summary judgment, and at a minimum direct the District Court to review the documents *in camera* withheld under a claim of national security.

Furthermore, State Department document C05404110 is described as a one-page draft of briefing material "for a senior Department official who was scheduled to meet with David Sanger [the <u>New York Times</u> reporter]. Where other officials are named, the unnamed official appears to be then Secretary Hillary Clinton. At a minimum, the identity of the "senior Departmental official" must be disclosed to establish a claim of privilege pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert denied*, 415 U.S. 977 (1974). However, the 1 page briefing paper must be disclosed or at least examined *in camera.* Being only 1 page long for a meeting with a reporter, it is evident that the contents of the 1 page brief were delivered in full to the reporter by the official and the document does not contain any deliberation. Given that the Secretary most often speaks publicly for any Department, the senior status of the official meeting with a <u>New York</u> <u>Times</u> reporter reduces, not increases, the justification for withholding the document. The District Court should review document C05404110 *in camera.*

Plaintiff, through its Chairman and General Counsel, filed a Motion for Discovery on June 10, 2013, for the opportunity to conduct discovery to obtain the

requisite facts.  (ECF Docket # 18), and filed a Supplement to the Motion for

Discovery on June 14, 2013 (ECF Docket # 19).  Plaintiff-Appellant, by Larry

Klayman, filed an affidavit pursuant to Federal Rules of Civil Procedure Rule

56(d) setting forth with precision why discovery is needed to allow the Appellant

to meaningfully participate in a Rule 56 motion for summary judgment and meet

the motion with contrary facts, and what discovery is needed.  (ECF Docket # 13-

1).  Depositions of the agency custodian of records, or presumptively the Affiants

proffered by the agencies to provide the Declarations filed, are needed.

## STANDARD OF REVIEW

The standard of review on the decision to grant or deny summary judgment

is *de novo. Gentiva Healthcare Corp. v. Sebelius*, 2013 U.S. App. LEXIS 14886

(D.C. Cir. July 23, 2013) citing *Arizona v. Thompson*, 281 F.3d 248, 253 (D.C. Cir.

2002).  A Court of Appeals' review of the district court's grant of summary

judgment is de novo. *See Soto-Padró v. Pub. Bldgs. Auth.*, 675 F.3d 1, 5 (1st Cir.

2012).

A Court of Appeals views the facts in the light most favorable to the

nonmoving party, and may uphold the District Court's order only if there is no

genuine dispute of material fact and the movant is entitled to judgment as a matter

of law. *See Candelario del Moral v. UBS Fin. Servs. Inc. of P.R.*, 699 F.3d 93, 99

(1st Cir. 2012).

> "[A] two-step standard of review applies to summary judgment in FOIA cases. The court first determines under a *de novo* standard whether an adequate factual basis exists to support the district court's decisions. If an adequate factual basis exists, then the district court's conclusions of fact are reviewed for clear error, while legal rulings, including its decision that a particular exemption applies, are reviewed *de* novo."

*Lane v. Dep't of Interior,* 523 F.3d 1128, 1135 (9th Cir. 2008) (internal citations omitted).

The standard of review of a District Court's decision to grant relief under a

Rule 56(d) motion is abuse of discretion.  *See Pardo-Kronemann v. Donovan,* 601

F.3d 599 (D.C. Cir. 2010).

## <u>SUMMARY OF ARGUMENT</u>

The District Court improperly granted summary judgments to the

Defendants without allowing Plaintiff the opportunity to take discovery. Like in

*Association of Am. Physicians & Surgeons v. Clinton*, 997 F.2d 898 (D.C. Cir.

1993), discovery was appropriate and necessary. Just as in *Association of Am.*

*Physicians & Surgeons*, the Court relied on declarations given by the Defendants

and granted summary judgment without allowing the Plaintiff to take discovery. In

that case, the U.S. Court of Appeals for the District of Columbia Circuit, this very

same Court, reversed the District Court's holding that denying plaintiff the

opportunity to take discovery was improper.  This Court remanded the case and

ordered expedited discovery, and the same outcome is appropriate here.

## ARGUMENT

## A.  Judicial Precedent Must be Reconsidered to the Extent in Conflict with the Clear Congressional Intent of the Statute and Congressional Enactment

Initially, it is logically proper to consider these issues within the proper

context and framework.  Recognizing that "to err is human," appellate courts exist

for the very purpose of seeking to get decisions right, as much as humanly

possible.  Sometimes that pursuit of elusive perfection includes back-tracking.

As enacted by Congress, the Freedom of Information Act, 5 U.S.C. § 552

does not contain any hint of the treatment sometimes afforded to the Act by

Federal courts with regard to summary judgment.

As made abundantly clear by the United States Court of Appeals for the

District of Columbia Circuit:

> The Freedom of Information Act is to be viewed as a
> remedial statute and is to be construed liberally, and it is
> the exemptions that are to be construed narrowly. This,
> too, may not be ultimately in accord with the best interest
> of this country, but that is what the law says and the courts
> have largely followed it.

13

*Ginsburg, Feldman & Bress v. Federal Energy Admin*., 591 F.2d 717 (D.C. Cir.

1978)

> Intended to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed," *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S.Ct. 2311 2327, 57 L.Ed.2d 159 (1978), the Freedom of Information Act requires federal agencies to disclose information upon request unless the statute expressly exempts the information from disclosure. 5 U.S.C. § 552 *et seq*

*Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003)

> FOIA grants access to government archives for public dissemination of "'official information long shielded unnecessarily from public view.'" *Milner v. Dep't of Navy,* 131 S. Ct. 1259, 1262 (2011) (quoting *EPA v. Mink,* 410 U.S. 73, 80 (1973)). Under FOIA, an agency must make government records available to the public upon a properly made request. 5 U.S.C. § 552(a)(3)(A). However, the agency need not disclose documents or information falling within any of nine statutory exemptions. *Id.* § 552(b)(1)-(9). The agency bears the burden of justifying the withholding of information under an exemption. *Id.* § 552(a)(4)(B).

*Prudential Locations LLC v. U.S. Dep't of Hous. & Urban Dev.,* 739 F.3d 424, 429

(9th Cir. 2013).

The purpose of FOIA is to "open[] up the workings of government to public

scrutiny" through the disclosure of government records. *Stern v. FBI*, 737 F.2d 84

(D.C. Cir. 1984) *citing McGehee v. CIA*, 225 U.S. App. D.C. 205, 697 F.2d 1095,

1108 (D.C. Cir. 1983).  Congress passed this legislation in the belief that "an

informed electorate is vital to the proper operation of a democracy." *Id*.

Plaintiff seeks to be informed about the actions of the federal government, in a specific attempt to inform the public about how and why the federal government is releasing information to the news media, public, and our enemies, about Israel's possible military action against Iran, thus crippling Israel's plans.

FOIA serves to expose the operations of federal agencies "to the light of public scrutiny." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted) (quotation marks omitted). The statute embodies a broad policy in favor of disclosure, reflecting the notion that "promot[ing] an informed citizenry . . . is vital to democracy." *Carpenter v. U.S. Dep't of Justice, 470 F.3d 434*, 437 (1st Cir. 2006).

In sharp contradiction to that principle, however, more recently some Federal Courts have adopted the idea that summary judgment may be granted – almost uniquely in FOIA cases, in a dramatically different way from almost any other case – without reasonable discovery first being allowed as provided in the Federal Rule of Civil Procedures.  "[D]istrict courts typically dispose of FOIA cases on summary judgment before a plaintiff can conduct discovery." *Rugiero v. U.S. Dep't of Justice,* 257 F.3d 534, 544 (6th Cir. 2001).

The U.S. Government in many FOIA cases would have us believe that once

15

a Complaint is filed, plaintiffs have no role but to blindly accept whatever they are told by the U.S. Government. The entire process of a normal lawsuit is shriveled down to the FOIA requester and the Court simply believing and passively accepting whatever the Federal agency and its lawyers want to claim.

## B.  Judicial Precedent Setting the Burden Upon the FOIA Requester Rejects the Core Purpose of the Freedom of Information Act

By its very nature, the Freedom of Information Act at 5 U.S.C. § 552 is intended to shift the burden from citizens seeking to obtain information out of U.S. Government agencies and instead to place the burden upon U.S. Government agencies to disclose information (in the form of documents) subject only to narrow exemptions where disclosure would cause particularized harms.

How, then can we reconcile these truths with a practice of carving out a particularly onerous burden placed uniquely upon FOIA requesters and Plaintiffs that exists almost nowhere else, so as to deprive a FOIA requester of discovery available in almost every other type of case? We cannot reconcile the two.

Creating a nearly unique and extreme burden upon FOIA requesters and Plaintiffs cannot be harmonized with the Congressional enactment or the Federal Courts' early interpretation of it. The Congressional enactment must stand while precedents that have taken some wrong turns must fall.

16

It does violence to FOIA and the Congressional intent to place the burden upon a Plaintiff to prove what is going on inside the U.S. Government in order to find out what is going on inside the U.S. Government.

It is unmistakably the intent of the Act, with no other alternative appearing to be considered, to burden government with the responsibility of explaining itself to the citizens. Those citizens are the owners and shareholders of the country -- not the government's subjects.

A reluctance to enforce the Act or efforts to spare government from its effects is tantamount to repealing the Congressional enactment by judicial fiat and bureaucratic intransigence. That is, in other words, it is impossible to consider FOIA without confronting its essential nature: FOIA shifts the burden from the citizen to the government. That is its very purpose and its one and only meaning.

To seek to avoid placing a burden upon the U.S. Government is a fundamental rejection of FOIA at its core. The Congressional intent apparent on the face of the Act is for the citizenry to know what the citizens' hirelings in government are doing.

The United States of America is uniquely founded on the concept that the government is an agent to "We the People" and the government owes to the citizens the same duties that any traditional, common law fiduciary agent owes to a

principal of fiduciary duty, *U.S. v. York*, 112 F.3d 1218, 1222 (D.C. Cir. 1997)

("An agent owes its principal a fiduciary duty"), duty of loyalty, *Mack v. American*

*Security & Trust Co.*, 191 F.2d 775, 777(D.C. Cir. 1951), and duty of accounting,

*Philips v. United States*, 59 F.2d 881, 885 (D.C. Cir. 1932) ("the intention to clothe

them with the authority of an agent to sell, which, of course, involves the duty of

accounting").

Furthermore, the ability to locate records on matters of public concern is

essential to the successful functioning of the U.S. Government.  FOIA is a burden

only to the extent that the U.S. Government finds itself disorganized and ill-

managed.   So, for example, when Freedom Watch sought documents from the

State Department in another matter, State claims it has no documents, and then

Freedom Watch staff finds four (4) responsive documents posted on the State

Department's website within about 10 minutes, any burden from FOIA results only

from government being ill-prepared to perform its essential functions.[1]

Encouraging government to become better at retrieving documents serves an

important goal of national benefit.  Discovering that government cannot find its

own documents – which are kept for its employees to make use of – is perhaps the

---

[1] See, *Freedom Watch, Inc. v. U.S. Department of State*, Civil Action No.
5:13-cv-00419-ACC-PRL, U.S. District Court for the Middle District of Florida
(Ocala).

greatest Freedom of Information revelation of all.

## C.  No Support Can be Found in the Congressional Enactment to Carve Out Onerous Exception Unique to the Freedom of Information Act

Not only is there no hint of the idea that summary judgment can be granted without discovery in the Act, but what is specified contradicts such a notion.

The Freedom of Information Act provides at 5 U.S.C. § 552(4) --

> **(B)** On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, ***and may examine the contents of such agency records in camera*** to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

*(Emphasis added.)*

5 U.S.C. § 552(4)(B) tells us explicitly that the District Court "***may examine the contents of such agency records in camera.***"  Having a stack of identified but disputed documents in hand, which may be examined *in camera*, is hardly

consistent with a lack of discovery procedures in a FOIA case. This indicates the usual process of discovery, with discovery disputes being actively resolved by the District Court, including reviewing challenged documents *in camera.*

Otherwise, where would these documents to be examined *in camera* come from, which 5 U.S.C. § 552(4)(B) refers to? How would the trial judge learn of their existence? What would prompt an *in camera* review of disputed documents if there is no discovery occurring in FOIA cases?

Moreover, 5 U.S.C. § 552(4)(E) authorizes the payment of attorneys' fees and costs to Plaintiffs who substantially prevail in a FOIA complaint case. For what purpose? If as U.S. Government agencies urge, the only role of a FOIA Plaintiff is to sit back, wait, and passively accept whatever Defendants claim – unexamined and unchallenged – for what work or service of value would attorneys' fees be appropriate, such that the U.S. Government as a matter of law should pay for the legal work involved in obtaining disclosure? What work did Congress envision attorneys doing that they should be paid out of the public Treasury for the service of forcing disclosure of documents? The U.S. Government would have us believe that once a Complaint is filed, Plaintiffs have no role but to blindly accept whatever they are told by the U.S. Government.

Moreover, 5 U.S.C. § 552(4) considers in many places that a District Court

may order production of documents improperly withheld.  For example,

> "Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, …"

5 U.S.C. § 552(4)(F)(i).

How, then, _without discovery_ would a District Court ever determine that undisclosed documents had been improperly withheld?  How would a District Court order documents to be produced of which the Court has no knowledge?

The only scenario for this would be that an agency disclosed but withheld documents under a claim of exemption.  But how then would agency personnel be found to have "acted arbitrarily or capriciously" by openly disclosing the existence of documents in a _Vaughn Index_ and innocently claiming an exemption that the Court might simply disagree with?

How would it ever come to the District Court Judge's attention that documents had been improperly withheld if FOIA cases – unique among nearly all Federal litigation – does not normally permit discovery?  The most that could happen is that the Court disagrees with a good faith claim of exemption.

Clearly, we find no hint that Congress expected any variation from the

Federal Rules of Civil Procedure governing discovery and summary judgment from the normal rules with respect to Congress' enactment of the Freedom of Information Act.

Congress when legislating is presumed to be aware of prior law, including the Federal Rules of Civil Procedure. Generally: "Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978). The Federal Rules of Civil Procedure were originally enacted in 1938, while the Freedom of Information Act was enacted in 1966.

Here, Congress enactment of 5 U.S.C. § 552(4) is presumed to have created a civil right of a cause of action against a backdrop of Congress' full awareness of the Federal Rules of Civil Procedures Rules on discovery and summary judgment.

As a matter of law and interpretation, Congress created FOIA realizing that summary judgment is strongly disfavored without a full and fair opportunity to engage in discovery. If Congress intended to carve out a special exception for FOIA cases, it certainly offered no hint of it. On the contrary, construction of the Act requires us to assume that Congress intended what the Federal Rules of Civil Procedure normally provide.

**D.**     **The District Court Erred When it Granted Defendants' Motion for**

22

**Summary Judgment, Because the Defendants Did Not Establish that the Search was Adequate**

Concerning the Appellant's first question presented, boiled down to its essential core, the Defendants here, as in many other FOIA cases, performed only a database keyword search, while burying this central fact within several impressive-sounding Declarations of many tangential details.

The search performed by the Defendants is not adequate to either justify summary judgment or comply with FOIA in general, because the key word searches are not reasonably calculated to locate responsive documents.

First, the Defendants here as with other FOIA cases made no attempt to establish in the record that such keyword searches are effective.  Are keyword searches "reasonably calculated to locate responsive records?"  There is certainly nothing in the record to substantiate that proposition.

The U.S. District Court previously found computer database searches inadequate, and denied summary judgment because such a search is not adequate:

> At issue, then, is whether DOE conducted an adequate search, that is, whether its computerized database search could have been expected to produce the identities of the borrowers who were wrongly denied discharge of their loans. Under FOIA, a defendant agency is obligated to conduct a "reasonable" search for responsive records "using methods which can be reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68; see also *Campbell v. United States Dep't of Justice*,

23

> 164 F.3d 20, 28 (D.C.Cir. 1998) (noting that "FOIA demands only a reasonable search tailored to the nature of a particular request"). The government has the burden to show that it complied with the FOIA, and "in response to a challenge to the adequacy of its search for requested records the agency may meet its burden by providing a `reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials ... were searched.'"   *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 313-14 (D.C.Cir.2003) (citation omitted).

*Public Citizen, Inc. v. Department of Educ.*, 292 F.Supp.2d 1, 7 (D.C. Cir. 2003)

> Perhaps even more importantly, defendants have acknowledged that DOE failed to search the readily-available records most likely to reveal the information requested, namely, the paper discharge files. (Defs.' Opp. at 9-10.) "[A]n agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." Campbell, 164 F.3d at 28-29 (quotations omitted) (finding that when a search of one set of agency records revealed that information responsive to a FOIA request would be found in another set of records, a search of only the first set of records was inadequate); see also *Oglesby*, 920 F.2d at 68 (noting that "[a]t the very least, [the agency was] required to explain in its affidavit that no other record system was likely to produce responsive documents") (emphasis in original).

*Public Citizen, Inc.*, 292 F.Supp.2d at 8.

> However, because the database that was searched could not be relied upon to contain the requested information, it follows that no amount of searches of that database could be relied upon to turn up that information.

*Public Citizen, Inc.*, 292 F.Supp.2d at 7.

A key word search is an abstraction and a modern (very recent) substitute for

24

traditional searches of filing systems in existence when FOIA was enacted in 1966.
Traditionally, file folders existed devoted to certain topics.  The reliability of an
abstraction like a key word search would need to be established no less than a new
technique like a lie detector.

Second, key word searches are notoriously unreliable and unpredictable.
Law students are warned when taught legal research of the dangers of relying only
on keyword searches of legal databases. So ineffective and undependable are such
searches that Microsoft spent untold millions of dollars on television
advertisements openly mocking key word searches on the internet using Google,
while launching Microsoft's Bing search engine as better. [2]

Third, the Declarations of the Defendants make clear that the Defendants
searched for only a few of the categories of documents requested, while ignoring
other categories of documents requested by Plaintiff-Appellant's FOIA request.
Key word searches focused on one reporter, David E. Sanger, rather than the

---

[2]      See: "All Bing search overload commercials", You Tube,
https://www.youtube.com/watch?v=LV-2-h-FfiM .  However, both Google and
Bing are much more sophisticated than the searches conducted by the Defendants,
with Bing arguing that its search algorithms are far more effective than Google's.
Neither are as simplistic as the Government's.  Even Google will suggest similar
search terms in case a term has been mis-spelled and will intelligently include
search results that minimize the harsh errors of a simple keyword search.  Bing
claims to be more sophisticated in its intelligence.  By contrast, the Government's
search tools are much more likely to miss responsive documents.

underlying substance of the reports or the more important issue of a leak.

Compare all of this with a more traditional approach of actually identifying who in the agency deals with issues relating to Iran, narrowing that down to issues of cyberwarfare against Iran by either the U.S.A. or its allies, and then simply asking them by memorandum or in person what documents that office or those offices might have worked on that are responsive to the FOIA request. The intelligent involvement of those humans who actually worked on the subject matter will be superior to a mindless computer keyword search. Recall that the documents exist as part of those people's work, for their use and reference.

**E.     The District Court Erred When it Granted Defendants' Motion for Summary Judgment, Because the Defendants Did Not Meet their Burden Under the law**

A U.S. Court of Appeals reviews trial Court decisions granting summary judgment in FOIA cases *de novo. Sussman v. U.S. Marshals Serv.,* 494 F.3d 1106, 1111-12 (D.C. Cir. 2007);  *Hunton & Williams v. U.S. Dep't of Justice*, 590 F.3d 272, 276-76 (4th Cir. 2010).

"[A] two-step standard of review applies to summary judgment in FOIA cases. The court first determines under a *de novo* standard whether an adequate factual basis exists to support the district court's decisions. If an adequate factual

26

basis exists, then the district court's conclusions of fact are reviewed for clear error, while legal rulings, including its decision that a particular exemption applies, are reviewed *de* novo." *Lane v. Dep't of Interior,* 523 F.3d 1128, 1135 (9th Cir. 2008) (internal citations omitted).

The adequacy of an agency's search for documents under the FOIA is judged by a standard of reasonableness and depends upon the facts of each case." *Id.* Adequacy "is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).

The government bears the initial burden of showing that it conducted an adequate search. As part of meeting this burden, it may provide an affidavit describing the search it conducted in response to the plaintiff's request. *Id.* at 314-15. "[I]f an agency demonstrates that it has conducted a reasonably thorough search, the FOIA requester can rebut the agency's affidavit only by showing that the agency's search was not made in good faith." *Maynard v. C.I.A.,* 986 F.2d 547, 560 (1st Cir. 1993); *see also Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (stating that agency has duty to make "a good faith effort to conduct a search for the requested records").   If the plaintiff demonstrates that the agency acted with a lack of good faith in conducting the search, summary

judgment must be denied.  *See Maynard*, 986 F.2d at 560.

Under FOIA, adequacy is determined not by "whether relevant documents might exist, but whether the agency's search was 'reasonably calculated to discover the requested documents.'" *Maynard*, 986 F.2d at 559 (quoting *Safecard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1201 (D.C. Cir. 1991)).

However, in this case, the Defendants simply assert that searches using a key word technique were done.  We are treated to an extended and impressive virtual tour of the agency's systems and records.  We are given lots of detail that do not speak to the point.  But what we don't see is any claim or proof that key word searches are an effective way to find documents or reasonably calculated to locate responsive documents.

For example, we know from experience that a single typographical error, typing "Sangor" or "Samger" instead of for reporter "Sanger" would cause such a search to miss responsive documents.  Phone records tagged with initials "DES" or with the news organization "NY Times" would be missed by a keyword search.

If the searchable databases were created by scanning documents and applying Optical Character Recognition (OCR) techniques to convert an image of a document into computer (searchable) text, we know from experience that the software can and does create very significant errors in both quantity and type.  The

28

same is true if voice recordings are converted into database text.  Therefore, a keyword search for "Daniel E. Sanger" could and will easily miss documents that are responsive because of errors in automated transcription of documents from an image of a document into computerized, searchable text.

None of this has been addressed so as to establish for the Court and convince the Court that the method used is adequate, reasonable under the circumstances, or reasonably calculated to locate responsive documents.

By contrast, in terms of reasonableness, the traditional method for searching for responsive documents, in force when FOIA was enacted in 1966, was to approach the office responsible for the subject matter – in this case cyberwarfare with Iran – and simply ask if they have any responsive documents within the relevant offices.   Those who actually do the relevant work will know where to find the documents.  After all, the documents exist for them to use in their work.

Here, the Defendants have not established that substituting key word searches for the traditional method is an effective technique which is reasonably calculated to locate responsive documents.


**F.   The District Court Erred When it Granted Summary Judgment Before Allowing Plaintiffs to Take Discovery of the Defendants.**

Concerning the Appellant's second question presented, "Summary judgment

29

is proper only "after adequate time for discovery . . . ." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986). Under Rule 56(d), a court "may deny a motion for

summary judgment or order a continuance to permit discovery if the party

opposing the motion adequately explains why, at that timepoint, it cannot present

by affidavit facts needed to defeat the motion." *Strang v. U.S. Arms Control &*

*Disarmament Agency*, 864 F.2d 859, 861(D.C. Cir. 1989); *Londrigan v. Fed.*

*Bureau of Investigation*, 670 F.2d 1164, 1174(D.C. Cir. 1981).

Discovery and depositions into the nature of an agency's search is proper,

especially with regard to those agency officials or employees that the agency has

identified as having knowledge by proffering their Declaration. See, *Judicial*

*Watch, Inc. v. Dep't of Commerce*, 34 F.Supp.2d 28, 29-41 (D.D.C. 1998);

*Judicial Watch, Inc. v. Dep't of Commerce*, 337 F.Supp.2d 146, 156-57 (D.D.C.

2004).

"[T]he purpose of Rule 56(d) is to prevent railroading the non-moving party

through a premature motion for summary judgment before the non-moving party

has had the opportunity to make full discovery." *Dickens v. Whole Foods Market*

*Group, Inc.*, 2003 WL 21486821, at *2 n.5 (D.D.C. Mar. 18, 2003) (citing *Celotex*

*Corp.*, 477 U.S. at 326.

Here, the Defendants proffered Affiants who provided Declarations,

admitting that those Affiants (Declarants) are knowledgeable as to the FOIA search conducted, available as knowledgeable witnesses, and amenable to scrutiny. Some were also proffered as knowledgeable about the appropriateness of the claims of exemptions.  Limited depositions of the Affiants that the Defendants chose to proffer is appropriate to develop the record and to permit a meaningful participation in the FRCP Rule 56 process would be appropriate.

Otherwise, the Defendants' approach adopted by the District Court does violence to the FRCP Rule 56 process.  That approach maintains that  there is no genuine dispute as to material facts because those facts are being withheld from the non-moving party by the moving party.  Furthermore, unless the FOIA is brought by an employee internal to the government agency, no such facts could ever be known or discovered to allow the FOIA requester to meaningfully participate in the process provided by FRCP Rule 56.

## G. The District Court Abused its Discretion When It Granted Summary Judgment Despite Plaintiff Having Filed a Rule 56(d) Affidavit.

Under FRCP Rule 56(d), "If a nonmovant shows by affidavit or declaration that for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavit or declarations or to take discovery; or (3) issue any other appropriate

order." As explained by the Advisory Committee on Rules, "[w]here an issue of as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Even further, "summary judgment is inappropriate where the party opposing it shows under subdivision [(d)] that he cannot at the time present facts essential to justify his opposition." FRCP Rule 56 advisory comm. (2012).

A non-moving party seeking the protection of Rule 56(d) must by affidavit "state the reasons why he is unable to present the necessary opposing material." *Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Wash.*, 699 F.2d 1274, 1278 n.6 (D.C. Cir. 1983); *see also Hotel & Rest. Employees Union, Local 25 v. Attorney Gen.*, 804 F.2d 1256, 1269 (D.C. Cir. 1986) (noting that this affidavit requirement helps "prevent fishing expeditions"), *vacated on other grounds*, 808 F.2d 847 (D.C. Cir. 1987). The non-moving party bears the burden of identifying the facts to be discovered that would create a triable issue and the reasons why the party cannot produce those facts in opposition to the motion. *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 248 n.8 (D.C. Cir. 1999). The non-moving party must show a reasonable basis to suggest that discovery would reveal triable issues of fact. *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 231, 237 (D.C. Cir. 1999).

32

The Plaintiff-Appellant submitted a Rule 56(d) affidavit (JA __) (ECF Docket #13-1), fully complying with the rule.

As set forth in the Complaint and Plaintiff's Opposition to Defendant's Motion to Dismiss, there were widely reported accounts in credible news sources that the Defendant agencies had leaked classified material so as to undermine the effectiveness of the State of Israel's and the United States of America's efforts to contain terrorism and regional and global military threats by Iran.

Because of the lack of information necessary to oppose Defendants' declarations, Plaintiff submitted its motion pursuant to Rule 56(d), "that it cannot present facts essential to justify its opposition."

In the Plaintiff's Motion to Take Discovery (ECF Docket # 18), the Appellant set forth the following reasons:

> 2. To date, State has repeatedly told this Court and Plaintiff that it has conducted a thorough search, only for State to admit later that it had not and that additional records were available. This last time, State requested another 60 day extension to do the "job" it should have done from the outset. It is unclear why additional records keep miraculously appearing if the original search was performed thoroughly.
>
> 3. There is a pattern in the Obama administration of delay, obfuscation, and outright obstruction of justice when it comes to "coming" clean on information and documents in a myriad of burgeoning scandals. Even the New York Times has recently opined on its editorial page that the Obama administration has lost all credibility.

* * *

6. Plaintiff asks this Court to simply allow it to depose a
designated representative of State, simply to see if an
adequate search was done. It obviously has not been done to
date and the circumstances raise a presumption that bad faith
behavior is at foot, as it has been with Fast and Furious,
Benghazi, the NSA, AP, Fox News and other recent
scandals.

* * *

8. Given the circumstances and facts of this case, in which
the Defendant has falsely told the Court and Plaintiffs twice
that it did not have any further documents only to reverse
itself again and again, there is no basis to deny Plaintiff's
request to depose the records custodian, or a person who has
principal knowledge of how the searches were and are being
allegedly performed.

The Defendants, in sole possession of the records, submitted nothing more

than the affidavits of people who performed a perfunctory search.

It is simply not possible for the Plaintiff to oppose a motion for summary

judgment without knowing what specifically what was done to search for

documents.

Discovery is appropriate and necessary, just as it was with regard to

*Association of Am. Physicians & Surgeons*, 997 F.2d at 898. Thus, under FRCP

Rule 56(d), Plaintiff should be allowed time to take discovery.

In *Association of Am. Physicians & Surgeons,* the Honorable Royce C.

Lamberth of the District Court dismissed the plaintiff's complaint under FACA based on sworn declarations of the Clinton administration that non-governmental persons were not a member of the advisory committee and thus the advisory committee was not subject to FACA. The U.S. Court of Appeals for the District of Columbia Circuit, this very same Court, held that it had insufficient material in the record to determine the character of the working group and its members and so remanded for expedited discovery on the issue and for a determination regarding the working group. Importantly, when this discovery took place, it was learned that Hillary Clinton and her government employees had lied to the court and that indeed non-governmental persons were a part of the advisory committee.

*Association of Am. Physicians & Surgeons* is directly on point here as well. The Plaintiff is unable to ascertain the workings of the Defendant agencies and only through discovery would the functions of those who performed the search be determined.

Plaintiff Freedom Watch never had the opportunity to uncover its own facts and challenge those "facts" that the Defendants had presented.  Because of this reason, because summary judgment at its core is based upon the lack of disputed material fats, the District Court erred and abused its discretion in granting summary judgment to the Defendants.  Remanding the case to allow for discovery

35

about the search for requested documents would allow the Plaintiff to have the

opportunity to present its own facts which would have allowed for the summary

judgment determination to be proper.

## H.  The District Court Erred in Finding that the Defendants Had Properly Exempted the Release of Entire Documents and Redacted Portions of Otherwise.

Concerning the Appellant's third question presented, the Defendants

withheld and redacted documents under exemptions.  The Government bears the

burden of proving that information withheld falls within the exemptions it invokes.

5 U.S.C. § 552(a)(4)(B); *King v. DOJ*, 830 F.2d 210, 217 (D.C. Cir. 1987).

Defendants NSA, CIA, and DoD withheld documents categorically without

a *Vaughn Index* under 5 U.S.C § 552(b)(1).  This blanket assertion of the

exemption from disclosure is misplaced, erroneous, and an abuse of the legal

obligations under the FOIA, because Freedom Watch did not seek documents that

are classified concerning cyberwarfare against Iran or any other classified matter.

*Freedom Watch sought documents concerning a leak to the New York Times, and*

*the reasons and circumstances of the leak.*

The documents and information that the Obama Administration leaked to the

New York Times were classified, yet released to the New York Times

nevertheless.  However, the documents sought by Freedom Watch – *about* the leak,

36

not about Iran – are clearly not classified, but concern only persons who leak to the <u>New York Times</u>.

Thus the Defendants and the District Court confused the classified material leaked to the <u>New York Times</u> with the unclassified topic of a leak to a reporter. This Court should reverse and require the Defendants to provide these documents about the leak which are clearly not classified or related to national security.

No one – least of all foreign governments like Iran – will believe for a moment that the <u>New York Times</u> article is not true. Nations in which the news media is an arm of the ruling government or heavily regulated will not be dissuaded from an adamant belief that the vaunted <u>New York Times</u> would only print such a story if provided the information from the U.S. Government. Thus, withholding a thorough investigation of this government misconduct and hostility toward Israel does not serve national security or any legitimate interest.

Moreover, *none* of the Defendants submitted a *Vaughn* index, until belatedly the State Department finally did. Defendants declared simply that they could "neither confirm nor deny the existence or nonexistence of requested records responsive to [Plaintiff's] request."

This refusal to confirm or deny, commonly referred to as a *Glomar* response, under terminology derived from the D.C. Circuit's decision in *Phillippi* v. *CIA,* 546

37

F.2d 1009 (1976), is unsustainable where Appellant seeks documents about the persons who caused the leak, not about the underlying topics already published in The New York Times.

At the very least, the Defendants should provide the documents for review *in camera* so that the District Court can consider whether or not the documents are properly withheld. Defendant must produce a Vaughn Index. *Vaughn*, 484 F.2d at 820.

Defendants also withheld or redacted documents on the basis of personal privacy under 5 U.S.C. § 552(b)(6), privileged or deliberative process privilege documents under 5 U.S.C. § 552(b)(5) which may or may not be properly withheld.

However, in the Second Supplemental Declaration of Sheryl L. Walter, (JA __), (ECF Docket #23-1), attached as an Exhibit to Defendant's (Appellee's) Reply to Plaintiff's Opposition to Motion for Summary Judgment, Ms. Walter identifies the following documents that have been improperly withheld:

- C05404110 is a one-page draft of briefing material "for a senior Department official who was scheduled to meet with David Sanger [the New York Times reporter].

First, without identifying the "senior Department official" the required *Vaughn Index* disclosure requirements have not been met. This concerns a meeting

with a news reporter at the <u>New York Times</u>.  There is no justification for

withholding the identity of the official(s), as required for a *Vaughn Index*. See,

*Vaughn*, 484 F.2d at 820. Given that the identity of lesser officials who met with

David Sanger have been disclosed, it must be presumed that the official was then

Secretary of State Hillary Clinton, and that Hillary Clinton did indeed meet with

reporter David Sanger.  However, the identity cannot be withheld legally under

*Vaughn*.

Second, given that this document is only 1 page – and is briefing material –

it cannot contain much if any information that was not actually delivered to the

<u>New York Times</u> reporter David Sanger in the meeting.  Having actually delivered

the information in the 1 pager to a reporter, the Defendant-Appellee cannot

withhold the document under the deliberative process privilege.  Furthermore, the

designation "briefing material" is not deliberation about whether or not to take a

Departmental action, but obviously just factual information to prepare the senior

official for the interview.  The decision to undertake the interview was already

made.  Even if the 1 page briefing material contains suggestions on how to

"handle" the reporter, this would not be deliberation concerning a Departmental

action or decision.  Complete withholding is not warranted.

Third, the 1 page briefing material is obviously not "preliminary" ideas in

development but a final presentation for the senior official to use in providing information to the reporter.

If this information could be shared with a reporter for <u>The New York Times</u>, it can be shared with FOIA requester Freedom Watch.

At the least, document C05404110 should be inspected *in camera*. There are many other redactions identified by Ms. Walter to which Freedom Watch raises no objection.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff-Appellant respectfully requests that the decision of the District Court be reversed and that the case be remanded for further proceedings for the Defendants to produce the *Vaughn Index* information required, produce documents whose withholding is suspect for *in camera* review by the District Court Judge, and so that Plaintiff-Appellant is allowed to conduct discovery necessary in order to obtain crucial and significant information about the flawed search in order that responsive documents can be produced.

**Oral argument is respectfully requested.**

Dated:  November 10, 2014

Respectfully Submitted,

 /s/ *Larry Klayman*
Larry Klayman, Esq.
D.C. Bar No. 334581
Freedom Watch, Inc.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,013 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Respectfully submitted,

/s/ *Larry Klayman*
Larry Klayman, Esq.
D.C. Bar No. 334581
Freedom Watch, Inc.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 10, 2104, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. I further certify that on the same day, I served the foregoing document on the following counsel by electronic service via the CM/ECF system:

Catherine H. Dorsey, Attorney
Email: catherine.dorsey@usdoj.gov
U.S. Department of Justice
(DOJ) Office of the Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530

Matthew M. Collette, Attorney
Email: Matthew.Collette@usdoj.gov
U.S. Department of Justice
(DOJ) Civil Division, Appellate Staff
Firm: 202-514-2000
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*Attorneys for Defendants-Appellees.*

Respectfully Submitted,

 /s/ *Larry Klayman*
Larry Klayman, Esq.
D.C. Bar No. 334581
Freedom Watch, Inc.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

43

Appendix 1

If it has to be next week then I would suggest Friday afternoon (3/16) around 1;30 because she all the Ambassadors here for COM conference wanting to meet, plus speaking to their Regional Conferences. So do you think that will be good enough?

Margo Morris
Personal Assistant
Under Secretary for Political Affairs
Department of State
202 647-2471

**From:** Sherman, Wendy R
**Sent:** Friday, March 02, 2012 12:56 PM
**To:** Hammer, Michael A
**Cc:** Grantham, Chris W; Morris, Margo T
**Subject:** Re: Sanger seeking to talk to you

Sounds fine. Whatever you think best.

**From:** Hammer, Michael A
**Sent:** Friday, March 02, 2012 12:21 PM
**To:** Sherman, Wendy R
**Cc:** Grantham, Chris W; Morris, Margo T
**Subject:** Sanger seeking to talk to you

Wendy – Sanger is writing a book on the Obama Admin's foreign policy to be published this June. He has talked to scores of people, including the Secretary, Bill, Jake, Kurt, Bob Einhorn and over at NSC and other agencies. We have been cooperating with him on this project and the chats have all been on background with anything on the record to be approved by us.

B5

Shall we offer him a time upon your return ?

Appendix 2

USCA Case #14-5174     Document #1521672     Filed: 11/10/2014     Page 55 of 59

You are currently viewing the printable version of this article, to return to the normal page, please click here.

# In classified cyberwar against Iran, trail of Stuxnet leak leads to White House

By Rowan Scarborough - The Washington Times - Sunday, August 18, 2013

The Obama administration provided a New York Times reporter exclusive access to a range of high-level national security officials for a book that divulged highly classified information on a U.S. cyberwar on Iran's nuclear program, internal State Department emails show.

The information in the 2012 book by chief Washington correspondent David E. Sanger has been the subject of a yearlong Justice Department criminal investigation: The FBI is hunting for those who leaked details to Mr. Sanger about a U.S.-Israeli covert cyberoperation to infect Iran's nuclear facilities with a debilitating computer worm known as Stuxnet.

A New York Times story adapted from the book, "Confront and Conceal: Obama's Secret Wars and Surprising Use of American Power," quotes participants in secret White House meetings discussing plans to unleash Stuxnet on Iran.

The scores of State Department emails from the fall of 2011 to the spring of 2012 do not reveal which officials told Mr. Sanger, but they do show an atmosphere of cooperation within the administration for a book generally favorable toward, but not uncritical of, President Obama. For example:

"I'm getting a bit concerned about the pace of our interviews — or lack of pace, to be more precise — for the book," Mr. Sanger said in an email Oct. 30, 2011, to Michael Hammer, a senior State Department public affairs official. "The White House is steaming away; I've seen [National Security Adviser Thomas E.] Donilon many times and a raft of people below. Doing well at the Pentagon. But on the list I sent you starting on Sept. 12 we've scheduled nothing, and chapters are getting into final form."

Mr. Sanger's book debuted in June 2012 and brought an immediate call from Republicans to investigate the leaks. They charged that administration officials jeopardized an ongoing

secret cyberattack by tipping off Iran's hard-line Islamic regime about war plans.

They also charged that Obama aides were leaking sensitive materials on other issues, such as the Navy SEAL-CIA raid to kill Osama bin Laden, to burnish Mr. Obama's credentials as commander in chief as the 2012 election approached.

The nonprofit Freedom Watch acquired the State Department emails via a Freedom of Information Act request filed days after the book was published. Larry Klayman, its director, said State at first had told him it did not have any documents. He then filed suit in federal court.

In December, U.S. District Court Judge Robert L. Wilkins ordered State to turn over emails relating to its cooperation with Mr. Sanger.

**Officials line up**

"When you read the totality of those documents, it's a super-close relationship they are furthering with Sanger," Mr. Klayman said. "They were literally force-feeding him."

He said State has yet to provide transcripts of the Sanger interviews.

"I think the thrust of this is this requires a significant investigation," Mr. Klayman said, adding that he has provided the emails to the House Committee on Oversight and Government Reform.

A State Department spokesman did not respond to emails from The Washington Times requesting comment.

In one email, a public affairs official said Mr. Sanger wanted to discuss "Cybersecurity — particularly if there's a legal framework being developed on the offensive side." Stuxnet would be an example of an offensive cyberweapon.

Mr. Sanger's nudging seemed to do the trick. Over the next several months, Mr. Hammer, the senior public affairs official, arranged interviews with Secretary of State Hillary Rodham Clinton and a roster of senior aides.

By March 2012, Mr. Sanger had spoken with Deputy Secretary of State William Burns; Deputy Chief of Staff Jake Sullivan, who is now Vice President Joseph R. Biden's national security adviser; Robert Einhorn, then a special adviser on arms control; Harold Hongju

USCA Case #14-5174      Document #1521672      Filed: 11/10/2014      Page 57 of 59

Koh, State's legal adviser, and others.

In December 2011, Mr. Hammer sent an email summarizing Mr. Sanger's reporting and reproducing a story from the previous month headlined "America's Deadly Dynamics with Iran," which reported on the Stuxnet computer worm.

It is not unusual for authors to request and sometimes win access to administration officials. Mr. Sanger's access, however, is notable in that its subsequent disclosures prompted an FBI investigation in which agents have interviewed government officials.

## The worm on the loose

Mr. Sanger wrote a June 1, 2012, article on Stuxnet that was adapted from his book, which debuted later that week. In the story, he quoted "participants" in White House meetings on whether to continue attacking Iran with Stuxnet, which somehow had broken free into the Internet.

"At a tense meeting in the White House Situation Room within days of the worm's 'escape,' Mr. Obama, Vice President Joseph R. Biden Jr. and the director of the Central Intelligence Agency at the time, Leon E. Panetta, considered whether America's most ambitious attempt to slow the progress of Iran's nuclear efforts had been fatally compromised," the story said.

"Should we shut this thing down?" Mr. Obama asked, according to members of the president's national security team who were in the room."

Republicans said those passages alone are evidence that Obama aides broke the law by publicly disclosing a covert program.

With the story and book in print, State Department public affairs on June 7 sent to department officials a transcript of a floor speech delivered by Sen. John McCain that week. The Arizona Republican accused the administration of deliberately leaking secrets to portray Mr. Obama as a "strong leader on national security issues" in an election year.

"What price did the administration apparently pay to proliferate such a presidential persona highly valued in an election year?" he said. "Access. Access to senior administration officials who appear to have served as anonymous sources divulging extremely sensitive military and intelligence information and operations."

## 'Drones and cyber'

USCA Case #14-5174    Document #1521672    Filed: 11/10/2014    Page 58 of 59

Citing the book, Mr. McCain said: "The administration officials discussed a most highly classified operation that is both highly classified and still ongoing, an operation that was clearly one of the most tightly held national security secrets in our country until now."

Asked on CBS' "Face the Nation" on June 3, 2012, whether the administration leaked to him to bolster the president's image, Mr. Sanger said:

"I spent a year working the story from the bottom up, and then went to the administration and told them what I had. Then they had to make some decisions about how much they wanted to talk about it.

"All that you read about this being deliberate leaks out of the White House wasn't my experience. Maybe it is in other cases," he said. "I'm sure the political side of the White House probably likes reading about the president acting with drones and cyber and so forth. National security side has got very mixed emotions about it because these are classified programs."

Said Mr. McCain: "I don't know how one could draw any conclusion but that senior members of this administration in the national security arena have either leaked or confirmed information of the most highly classified and sensitive nature."

On June 5, The New York Times published a review of the Sanger book by Thomas Ricks, an author and former reporter for The Washington Post.

"Mr. Sanger clearly has enjoyed great access to senior White House officials, most notably to Thomas Donilon, the national security adviser," Mr. Ricks wrote. "Mr. Donilon, in effect, is the hero of the book, as well as the commenter of record on events. He leads the team that goes to Israel and spends 'five hours wading through the intelligence in the basement of the prime minister's residence.'"

Three days later, Attorney General Eric H. Holder Jr. announced that he had appointed two U.S. attorneys to investigate leaks, including the Stuxnet disclosures.

White House press secretary Jay Carney took offense to Mr. McCain's speech.

"Any suggestion that this administration has authorized intentional leaks of classified information for political gain is grossly irresponsible," he said.

## A 'target' in the probe

USCA Case #14-5174    Document #1521672    Filed: 11/10/2014    Page 59 of 59

In May, The New York Times reported: "The investigation into reporting by David E. Sanger of The Times, about efforts to sabotage the Iranian nuclear program, appears to be one of the most active inquiries."

In June, NBC News reported that the FBI had zeroed in on one of the nation's highest-ranking military officers at the time that Mr. Sanger was researching his book in 2011.

NBC said that retired Marine Gen. James E. Cartwright, former vice chairman of the Joint Chiefs of Staff and one of Mr. Obama's closest military advisers, was a "target" in the probe — a designation that often means the Justice Department plans to indict the person.

Gen. Cartwright retired in August 2011.

Mr. Donilon, the national security adviser, submitted his resignation in June and left the post last month.

More than any previous president, Mr. Obama has aggressively gone after leakers — in this case possibly members of his own inner circle.

The Justice Department took the unusual step of collecting data on phone calls to and from the Washington bureau of The Associated Press in an effort to find who leaked information about a foiled terrorist attack.

The Justice Department has charged two former CIA employees and one former National Security Agency worker with providing secrets to journalists. In all three of those cases, the FBI acquired the "smoking gun" by obtaining emails between the reporters and the leakers.

In all, the Obama administration has charged eight people with leaking secrets, the most recent being former NSA contractor Edward Snowden.

© Copyright 2014 The Washington Times, LLC. [Click here for reprint permission.](#)